### NORTHERN INSULATING CO. v. UNION FIBRE CO. et al.

(District Court, D. Minnesota, First Division. October 4, 1912. On Further Hearing, October 11, 1912.)

PATENTS (§ 312*)—SUIT FOR INFRINGEMENT—ESTOPPEL TO DENY VALIDITY.

    Evidence considered, and *held* to establish that defendant did not commence making an article which infringed a patent owned by complainant as assignee until after the patentee entered its employment, and was therefore affected by his estoppel to deny the validity of the patent.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 543–549; Dec. Dig. § 312.*]

In Equity. Suit by the Northern Insulating Company against the Union Fibre Company and James E. Lappen. On motion for preliminary injunction. Motion granted.

Williamson & Merchant, of Minneapolis, Minn., for complainant.

John E. Stryker, of St. Paul, Minn., and L. L. Brown, of Winona, Minn., for defendants.

WILLARD, District Judge. This case is here upon a motion for a temporary injunction in a suit alleging infringement of letters patent No. 908,601, dated January 5, 1909, for flax felt, issued to the defendant Lappen and certain assignees, and now owned by the plaintiff.

No question can be made as to the infringement. That appears from the affidavits of the defendants themselves. The validity of the patent has not been established by any judicial decree. The plaintiff's claim is that the defendants are estopped to assert its invalidity.

Lappen assigned all his rights in the patent on January 8, 1909, to the Le Roy Fibre Company, assignor of the plaintiff. He continued in the employ of the Le Roy Fibre Company, of which he was a stockholder, until February, 1910. On the 15th of that month he made his first contract with the defendant the Union Fibre Company. That contract, among other things, gave the company a certain time within which to exercise an option for the acquisition of certain Canadian rights. On February 26, 1910, a second contract was made between Lappen and the defendant company, apparently for the purpose of indicating the exercise by the company of the option above referred to. The second contract contained practically all that the first contract contained, but was more explicit in certain respects. It recited that Lappen considered himself defrauded out of his rightful interests in the Le Roy Fibre Company, and in certain patents which he had given the company the right to use, and that he was desirous of protecting his rights in connection therewith. The Union Fibre Company agreed to employ counsel and pay the expense of such litigation as should be decided upon by the parties, in order to secure Lappen's rights. Lappen agreed to assign to the Union Fibre Company a half interest in any property, patents, or stock interests which he might secure from the Le Roy Fibre Company, or from any of the individual stockholders connected therewith.

Lappen assigned, by the contract, to the Union Fibre Company, the exclusive right to use or manufacture material under any or all of his patents pertaining to the cooking, degumming, treating, or manufacture of flax fibre or insulating materials, and the exclusive right to employ and use all processes patented by him therefor, and the exclusive right to use all machinery patented therefor. By the terms of the contract the Union Fibre Company agreed to pay Lappen a royalty—

"upon all of the flax felt of the kind heretofore made commercially by the Le Roy Fibre Company, at Le Roy, Minn., which it shall manufacture during the life of his composition patent therefor, notwithstanding said composition patent shall be declared void, or the manufacture thereof shall be adjudged an infringement upon the Kelley patent."

The royalty specified in the contract was to be 15 cents per 1,000 square feet on all insulating materials ½ inch or over in thickness; 10 cents per 1,000 square feet on all material less than ½ inch, and not less than ⅜ of an inch in thickness; and 7½ cents per 1,000 square feet on all material less than ⅜ of an inch in thickness. These royalties were to be paid to the first party (Lappen) by the second

party (the Union Fibre Company), so long as the second party should see fit to manufacture under said patents, or until the expiration of said patents.

The contract up to this point said nothing about the employment of Lappen by the Union Fibre Company; but the second part of it did provide for such employment, and he agreed thereby to work for the company for $100 a month and to assign to the company an undivided half interest in any patents which he might secure, or inventions which he might make while he was in their employ. This contract was to continue at least until January 1, 1912.

Lappen continued in the employment of the defendant company under this contract until January, 1912, when on the 4th day of that month another contract was made between him and the Union Fibre Company. This contract contained the same agreement for the exclusive right to manufacture and sell under the Lappen patents as did the other contracts. It also provided for the payment of royalties in substantially the same way as did the prior contracts. It further provided that the Union Fibre Company should pay the royalties during the life of the patents, whether the same should be declared void or not, and whether they were adjudged an infringement upon the Kelley patent, or not, and regardless of whether Lappen should remain in the employ of the second party or not. This contract also provided for the employment of Lappen by the defendant company, and he is now in their employ under the terms thereof.

The patent in suit is not described in any one of these contracts by its number or by its date, but that it is covered by all of them admits of no doubt. If in February, 1910, when Lappen made his first contract with the defendant company and went into their employment, the defendant company had not manufactured and sold any flax felt like that described in Lappen's patent, the estoppel by which Lappen is unquestionably bound would extend to the company. It would then plainly appear that the defendant company acquired its knowledge of the patent and the way to manufacture the article described therein from Lappen, and under all the authorities its co-operation with Lappen in the infringement would be such as to estop it as well as him.

The vital question, therefore, in the case, is whether or not the Union Fibre Company had been engaged in manufacturing and selling this material prior to February, 1910. It claims that it had been prior even to the issuance of Lappen's patent, and it presented affidavits in support of that claim. One of these affidavits is made by Kelley, to whom the Kelley patent mentioned in the contracts above referred to was issued, who assigned his patent to the defendant company, and who for some time was in its employ. In this affidavit Kelley says that at Mineral Point, Wis., prior to 1901, he manufactured and sold considerable quantities of a product which is exactly described by the language used in the claims of the Lappen patent. He, however, gives the names of no persons to whom he made any such sales. He further says that in 1903, when he was manager of the lith depart-

ment of the defendant company, it, under his direction, made and sold many thousands of feet of the so-called flax fibre felt, which product he says is exactly described by the claims of the Lappen patent. He fails, however, to mention the names of any persons to whom any of this product was sold. He attaches to his affidavit a sample of the product, but he does not state when this sample was made. He simply says that it was identical with the article that he made at Mineral Point, and at the defendants' factory in Winona. John J. Brown's affidavit states that when employed by the defendant he knew that it, under the direction of Kelley, made many thousand feet of flax fibre lith and sold it, and that the product is the same as the product described in Lappen's patent. He, however, fails to give the names of any persons to whom the product was sold. Roe, another manager of the defendant, says that between 1902 and 1910 the defendant manufactured and sold large quantities of the product which is described in Lappen's patent, and that this product was sold under the name of flax fibre lith. The sample which he attaches he says was manufactured at Winona during the year 1908, or earlier. He gives the names of no purchasers of this article. The defendant Lappen in his affidavit says that prior to the 15th day of February, 1910, he saw specimens of flax felt which had been manufactured by the defendant company, and which were similar to the felt described in his patent. Lappen calls this article flax fibre felt. In Thompson's affidavit it is said that the sample attached thereto was actually made at the defendant company's factory in the year 1908, or earlier, and that he more than four years ago nailed it into a chicken coop. Thompson does not say that any of this article was ever sold. Alfred G. Brown, the manager of the defendant company, says that, beginning with the year 1903, his company sold to a large number of customers flax fibre lith, which he says is the same article as that described in the Lappen patent. He says that this material was extensively used by numerous customers for insulating purposes, and was sold under the name of flax fibre lith.

This is substantially all the evidence that is presented by the defendant. Upon the part of the plaintiff there was presented the affidavit of Gebhard Bohn, the president of the plaintiff company, who said that the White Enamel Refrigerator Company, another company in which he was interested, had acted as agent for the products of the Union Fibre Company for about a year from October 21, 1904, and that he never knew that the defendant company manufactured any material similar to the material manufactured under the Lappen patent, until 1911, and that the defendant company never marketed any such material through his company during the time it acted as the Union Fibre Company's agent.

J. L. Deppen, who was a salesman in Chicago from January, 1909, to January, 1911, in the office of Bingham & McParthin, sales agents of certain products of the defendant company, says that in the latter part of 1910 he sold, as such agent for the defendant company, a product called felt-lino, which Brown, the general manager of the

defendant company, says is the same product as flax fibre lith. Deppen also says that he never sold any of this product before that time. Boswell, in the employ of the Minneapolis Paper Company, says that from 1907 until the fall of 1910 his company bought from the defendant company more or less of two kinds of heat insulating materials. They never bought from the defendant company any such material as the defendant company now sells under the name of feltlino, nor did the defendant company ever offer any of that material to them.

The most satisfactory proof, however, upon this subject, is found in the documentary evidence. In a letter to the White Enamel Refrigerator Company, dated October 21, 1904, the defendant company gave a list of articles manufactured by the defendant company and the prices for said articles. Flax fibre lith does not appear in this list. Bohn testifies that this letter was written after a conversation between himself and officers of the defendant company, the subject-matter of which conversation was a proposed contract by which the White Enamel Refrigerator Company was to act as sales agent for the defendant company. It is difficult to believe that, if the defendant company really was then manufacturing and selling large quantities of flax felt, as they say they were, they would not have included it in the list of their products which they then furnished to their proposed sales agent.

There was also offered in evidence a catalogue published by the defendant company for the year 1906. Flax fibre lith nowhere appears in this catalogue as a product then manufactured or sold by the defendant company. It does contain a description of materials composing their different kinds of "lith," in nearly all of which some mineral element appears. It also contains a list of the company's customers in 1906. No affidavits are presented from any of these customers to the effect that they had purchased flax felt from the defendant company prior to 1910.

It is, moreover, very difficult to understand why the defendant company would employ Lappen in 1910, and pay him a royalty on all the flax felt produced by them thereafter under his patent, if prior to that time they were thoroughly well acquainted with the method of manufacturing that product, had been manufacturing it for several years before Lappen's application for his patent was filed, and claimed a right so to do.

It is not necessary to rely upon the rule announced in several cases that the existence of a prior use in patent cases must be established beyond a reasonable doubt. In this case the evidence establishes almost beyond a reasonable doubt that the defendant company never sold flax felt prior to Lappen's connection with it in 1910.

A temporary injunction, as prayed for in the complaint, should be granted. Whether or not the injunction should be suspended, so as to allow the defendant company to fulfill its contract with the Santa Fé Railroad Company, is a matter upon which I will hear counsel on Friday, October 11, 1912, at 12 o'clock noon.

### On Further Hearing.

This case came on to be further heard on October 11, 1912, with the same counsel appearing for the respective parties, pursuant to the direction contained in the decision filed October 7, 1912, concerning the suspension of the temporary injunction with reference to the contract between the defendant company and a subsidiary company of the Atchison, Topeka & Santa Fé Railway Company. After hearing counsel, it is now ordered that upon the filing by the plaintiff of a bond, with sureties to be approved by the clerk of this court, in the sum of $5,000, a temporary injunction issue as prayed for in the complaint.

It is further ordered that upon the filing of a bond by the defendant company, the Union Fibre Company, in the sum of $10,000, with sureties to be approved by the clerk of this court, it be allowed to complete its contract with the Santa Fé Land & Improvement Company, mentioned in the affidavit of A. G. Brown, filed on October 11, 1912, and the said injunction shall not operate so as to prevent such completion. Said bond shall be conditioned to pay to the plaintiff all profits which the said defendant may make out of said contract, or the damages which the plaintiff may suffer or has suffered by reason of the securing of said contract by the defendant, as the plaintiff may hereafter elect, if said injunction shall be made perpetual. As a further condition of being allowed to complete said contract,

It is further ordered that the said defendant file in the office of the clerk of this court a statement of the amount of material already furnished under said contract, and that on the 1st day of each month hereafter it file a statement of the amount of material furnished on the said contract during the preceding month.